UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-21050-CR-SEITZ/O'SULLIVAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

HENRY JACKSON,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the Motion to Suppress Post Arrest Statements (DE# 39, 2/6/09) and Motion to Suppress Identifications and Memorandum of Law (DE# 40, 2/6/09) filed by defendant Henry Jackson. On February 11, 2009, this case was referred to the undersigned by the Honorable Patricia A. Seitz, United States District Court Judge for the Southern District of Florida. (DE# 45, 2/11/09). Having held an evidentiary hearing on March 4, 2009 and carefully considered the defendant's motions, the court file and applicable law, the undersigned respectfully recommends that the Motion to Suppress Post Arrest Statements (DE# 39, 2/6/09) and Motion to Suppress Identifications and Memorandum of Law (DE# 40, 2/6/09) be **DENIED**.

## BACKGROUND

The defendant is charged by indictment with conspiracy to interfere with commerce by threats or violence (robbery) in violation of Title 18, United States Code, Section 1951(a), conspiracy to possess or carry a firearm during and in relation to or in furtherance of a crime of violence in violation of Title 18, United States Code, Section

924(o), interference with commerce by threats or violence (robbery) in violation of Title 18, United States Code, Section 1951(a) and possession or carrying a firearm during and in relation to or in furtherance of a crime of violence in violation of Title 18, United States Code, Section 924(c)(1)(A). See Indictment (DE# 1, 11/24/08).

On February 6, 2009, the defendant filed the instant Motion to Suppress Post Arrest Statements (DE# 39) and Motion to Suppress Identifications and Memorandum of Law (DE# 40). The government filed its responses on March 1 and 2, 2009. See Government's Response to Defendant's Motion to Suppress (DE# 54, 3/1/09) and Government's Response to Defendant's Motion to Suppress Post Arrest Statements (DE# 56, 3/2/09).

On March 4, 2009, the undersigned held an evidentiary hearing. The government presented the testimony of Detective Elio Garcia, Detective Pablo Camacho, Detective Michaelangelo Rojas, Detective Brad Burke, Detective Kelvin Cox, Detective Lazaro Rial and Detective Jeffrey Goldblatt in its case in chief and the testimony of Detective Gavin Hylton as a rebuttal witness. The defendant presented the testimony of the defendant and his mother, Charlet Robinson. The following exhibits were admitted into evidence: Government's Exhibits 1 through 13 and Defendant's Exhibit 1.

## FINDINGS OF FACT

**A.    Pre-Arrest Identification of Defendant**

The defendant was the subject of an investigation by the Robbery Intervention Detail (hereinafter "RID") bureau of the Miami-Dade Police Department. The investigation involved several armed robberies of food markets that took place in Miami-

Dade County, Florida from March 3, 2008 through March 26, 2008. When Detective Elio Garcia received information that the defendant was a suspect in the armed robberies, he prepared a photographic lineup. Detective Garcia compiled the photographic lineup using a database containing photographs from driver's licenses and bookings. The photograph of the defendant was a booking photograph from a prior arrest. Detective Garcia chose the photograph of the defendant that was most recently taken. The photographs of the other individuals in the lineup were also booking photographs.

The photographic lineup prepared by Detective Garcia consists of six color photographs. See Lineup, Government's Exhibit 4. The photographs are of African American males of similar age and body build, with very short hair, similar skin complexions and no facial hair. Two individuals, including the defendant, were wearing what appear to be red[1] crew neck t-shirts. A third individual is wearing a black shirt with what appears to be a red t-shirt or cloth draped over his right shoulder. Id.

The photographic lineup prepared by Detective Garcia was used in the investigation of three robberies: the Northside Supermarket robbery (Government's Exhibit 5), the Diamonds Supermarket robbery (Government's Exhibit 6) and the Grocery Primos robbery (Government's Exhibit 9). The same six photographs were used but the location of the defendant in each lineup was different.

The standard admonition was given to the witnesses presented with this

---

[1] Safety cell inmates wear red jumpsuits in the Miami-Dade County jail. These jumpsuits have a v-neck collar with buttons down the middle and are distinguishable from the red crew neck t-shirt worn by the defendant in the lineup photograph.

3

photographic lineup. See Photographic Show-up Admonition, Government's Exhibit 13. The witnesses were told that the photographs may or may not include the person who committed the crime, that hair styles and facial hair could easily change and that photographs do not always depict a person's true complexion. Id. The witnesses were also told not to tell other witness that they have or have not made an identification. Id. The witnesses identified the defendant as the person who committed the armed robberies.

Detective Michelangelo Rojas investigated the armed robbery that took place at the Bawa Food Market on March 22, 2008. Detective Rojas received information that the defendant was involved in that robbery. Detective Rojas prepared a lineup using the photographs from the county's database of booking photographs and driver's license photographs. See Lineups, Government's Exhibits 7 & 8. The six photographs used by Detective Rojas for each lineup were the same. However, the location of the defendant was different in each lineup.

Detective Rojas presented the lineup to two witnesses. The witnesses were separated when making the identification. Detective Rojas read the Photographic Show-up Admonition to each witness. See Photographic Show-up Admonition, Government's Exhibit 13. Both witnesses identified the defendant as the person who had committed the robberies.

**B.   Defendant's Arrest**

On March 28, 2008 at approximately 4:00 p.m., the defendant was with his brother in the food court parking lot of the Southland Mall in Miami-Dade County, Florida. The defendant was sitting in the driver's seat of his vehicle. The defendant's

4

brother was in the passenger seat.

The defendant was taken into custody by Detective Brad Burke. Detective Burke received information that the defendant could be armed. Detective Burke forcefully took the defendant out of the vehicle and directed the defendant to the rear of the vehicle. Detective Burke put the defendant on the ground with the defendant's arms behind his back and placed handcuffs on the defendant. Detective Burke patted the defendant down and found no weapons. After patting the defendant, Detective Burke stood the defendant up. The defendant's brother was also detained and subsequently released.

After the defendant was taken into custody, Detective Elio Garcia approached the defendant and advised the defendant that he was under arrest for armed robbery. Within one or two minutes of the defendant being taken into custody, Detective Garcia read the defendant his Miranda rights from a card. See Miranda Warning Rights Card, Government's Exhibit 10. Detective Garcia told the defendant that he had the right to remain silent and did not have to talk to law enforcement or answer any questions if he did not want to, that if the defendant talked to law enforcement, his statements could be used against him in court, that he had a right to have a lawyer present and that if he could not afford an attorney, one would be provided to him at no cost. Id. After each right, Detective Garcia asked the defendant if he understood that right. The defendant stated each time that he did understand. Detective Garcia asked the defendant if understanding these rights, he was still willing to answer questions without an attorney present.[2] The defendant stated that he was willing to talk to Detective Garcia without an

---

[2] Detective Garcia testified that although not on the card, he asked the defendant this question.

attorney.

Detective Garcia questioned the defendant concerning the location of Irvin Green, a co-defendant in this action. The defendant told Detective Garcia that he could take him to Mr. Green's house but did not want to be seen by Mr. Green. Detective Garcia arranged for an unmarked police vehicle with dark tinted windows to transport the defendant. The defendant was placed in the backseat of an unmarked vehicle with Detective Kelvin Cox and Detective Gavin Hylton. Detective Cox did not threaten or strike the defendant.[3] Detective Cox did not tell the defendant he had to cooperate.

---

[3] The defendant testified that Detective Cox struck the defendant in his eye and on his lip. The defendant's mother, Charlet Robinson, testified that the defendant was beaten by two police officers. Having observed the demeanor of the witnesses and considered their testimony as a whole, the undersigned credits Detective Cox's testimony that he did not physically or verbally intimidate the defendant, the testimony of Detective Hylton, who was in the unmarked vehicle, that Detective Cox did not strike the defendant and the testimony of the other detectives that the defendant did not appear injured, did not complain of any injuries and did not request medical attention. The undersigned does not find the testimony of the defendant or Ms. Robinson credible. See United States v. Boulette, 265 Fed. Appx. 895, 898 (11th Cir. 2008)(citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (noting that "[c]redibility determinations are within the province of the fact finder 'because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses.'"). The undersigned notes that there are several inconsistencies in the defendant and Ms. Robinson's testimony. For instance the defendant testified that he was struck in the left eye by Detective Cox. However, when presented with the booking photograph for the instant offense, the defendant testified that Detective Cox hit him in his right eye. The undersigned has carefully reviewed the booking photograph and finds that the booking photograph is not indicative of any injury to the defendant's eye. The booking photograph merely shows that the defendant's right eye appears smaller or more closed than his left eye. Similarly, the booking photograph does not depict any injury to the defendant's lip. The undersigned also finds inconsistencies with Ms. Robinson's testimony. Ms. Robinson testified that the defendant's brother called her and told her that police officers were beating the defendant. The defendant testified that Detective Cox struck him from inside an unmarked vehicle while the defendant was in the backseat. The undisputed testimony is that the unmarked vehicle had dark tinted windows. Therefore the undersigned does not find credible the testimony that the defendant's brother observed

6

The Robbery Intervention Detail ("RID") detectives caravaned south to the Goulds area of Miami-Dade County near co-defendant Green's residence. Detective Cox and Detective Hylton proceeded to locate the actual residence with directions from the defendant. The defendant was calm and helpful. He directed Detective Cox and Detective Hylton to Mr. Green's residence. Detective Cox and Detective Hylton observed Mr. Green sitting in the driveway of his residence. The defendant ducked in his seat when he saw Mr. Green outside his residence. Detective Cox and Detective Hylton radioed to the other RID detectives the address of Mr. Green's residence. Detective Cox and Detective Hylton were joined at Mr. Green's residence by the other RID detectives and proceeded to take Mr. Green into custody.

After Mr. Green was taken into custody, law enforcement officers moved the defendant to a marked police vehicle driven by Detective Lazaro Rial. The RID detectives located two firearms, a semiautomatic pistol and a revolver, in Mr. Green's residence. Detective Garcia told the defendant about the firearms that were recovered. The defendant told Detective Garcia that there was a third firearm, a chrome revolver, located in Mr. Green's father's bedroom in Mr. Green's grandmother's house. The RID detectives proceed in a caravan with the defendant and Mr. Green to Mr. Green's grandmother's house in Northwest Miami-Dade County. The officers retrieved a chrome revolver under the mattress in Mr. Green's father's bedroom.

---

the defendant being hit by police officers. The defendant also testified that the only officer who physically struck him was Detective Cox. Ms. Robinson testified that when she visited her son in jail a week after the arrest he gave her the names of the two officers who had hit him. The undersigned notes that the defendant, facing a substantial term of imprisonment, if convicted, has an interest in testifying that Detective Cox threatened him. Ms. Robinson has a similar interest in testifying favorably for her son.

**C.     Defendant's Written Miranda Waiver**

After recovering the third firearm, the police caravan transported the defendant and Mr. Green to the police station. Detective Rial took the defendant to an interview room at the station. Detective Jeffrey Goldblatt read the defendant his Miranda rights from a written Miranda waiver form. See Miranda Waiver Form, Government's Exhibit 1. Detective Goldblatt asked the defendant to write certain information on the form. The information written by the defendant indicated that he was 19 years old at the time of his arrest, that he had either enrolled in or completed the 11th grade at Miami Northwestern Senior High School, that he could read and write in English and that he was not under the influence of drugs, alcohol or medication. Id. The defendant was cooperative. He appeared calm, he was not anxious and did not seem scared.

The written Miranda waiver form that Detective Goldblatt presented to the defendant stated as follows:

> BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND THE FOLLOWING RIGHTS:
>
> 1.   You have the right to remain silent and you do not have to talk to me if you do not wish to do so. You do not have to answer any of my questions. Do you understand that right?
>
> 2.   Should you talk to me, anything which you might say may be introduced into evidence in court against you. Do you understand?
>
> 3.   If you want a lawyer to be present during questioning, at this time or anytime thereafter, you are entitled to have the lawyer present. Do you understand that right?
>
> 4.   If you cannot afford to pay for a lawyer, one will be provided for you at no cost if you want one. [D]o you understand that right?
>
> KNOWING THESE RIGHTS, ARE YOU NOW WILLING TO ANSWER MY QUESTIONS WITHOUT HAVING A LAWYER PRESENT?

Id. (emphasis and capitalization in original).  The defendant was asked to answer each question by placing his initials in the space next to the words "yes" or "no."  The defendant placed his initials next to the word "yes" in response to each question. The final statement on the Miranda form is the following: "THIS STATEMENT IS SIGNED OF MY OWN FREE WILL WITHOUT ANY THREATS OR PROMISES HAVING BEEN MADE TO ME " Id. (emphasis and capitalization in original). The defendant initialed this statement and signed the form at the bottom at approximately 9:15 p.m. Id.

After obtaining the defendant's signed waiver of his Miranda rights, several detectives interviewed the defendant concerning his involvement in the robberies. The defendant was subsequently booked and photographed. See Booking Photograph of Defendant, Government's Exhibit 11 & 12. At no time did the defendant complain of any injuries or request medical attention.

**D.     Post Arrest Identification of Defendant**

Detective Pablo Camacho was a law enforcement officer investigating an armed robbery that took place at the Bermuda Market in Miami-Dade County. On April 17, 2008, Detective Camacho obtained a fingerprint analysis report indicating that a fingerprint recovered from a glass counter near the cash register at the Bermuda Market matched the defendant.

Detective Camacho prepared a lineup and contacted two witnesses of the Bermuda Market robbery. The lineup prepared by Detective Camacho used photographs from a database of booking photographs and driver's license photographs. See Lineup, Government's Exhibit 2 & 3. The photographic lineup prepared by

Detective Camacho consisted of six black and white[4] photographs. The six photographs were of black males of approximately the same age, approximately the same build, with similar skin complexion, very short hair and no facial hair. Id. The photograph of the defendant was the defendant's booking photograph in the instant case.

Detective Camacho subsequently presented the lineups to two witnesses of the Bermuda Market robbery. Detective Camacho told the witnesses that the person who committed the robbery may or may not be in the photograph and that the witnesses should not pay too much attention to hair styles or facial hair because such characteristics could change. Each witness was shown the same six photographs. However, the location of the defendant's photograph was different in the lineup presented to each witness. Detective Camacho changed the location of the defendant in each lineup to prevent the second witness from identifying the defendant based solely on the location of the defendant's photograph in the lineup. Both witnesses identified the defendant as the individual who had robbed the Bermuda Market.

## ANALYSIS

**A.   Photographic Identifications of the Defendant**

The defendant moves to suppress photographic identifications of the defendant by five witnesses. See Motion to Suppress Identifications and Memorandum of Law (DE# 40, 2/6/09). The defendant asserts that the photographic lineups were unduly suggestive. "In the instant case, the photographs shown of Defendant . . . suggested that he was in custody, under arrest, and one of the persons wanted for the robberies."

---

[4] Detective Camacho used black and white photographs because he did not have a color printer.

Id. at 2. The government disputes this claim. See Government's Response to Defendant's Motion to Suppress (DE# 54, 3/1/09).

The Supreme Court has developed a two-part test for admitting identification evidence. First, a court must inquire whether the police used an impermissibly suggestive procedure to obtain the identification. Manson v. Brathwaite, 432 U.S. 98, 106-07 (1977). If the court finds that the procedure was impermissibly suggestive, then the court must determine whether the identification was reliable. Id. at 114. In Neil v. Biggers, 409 U.S. 188, 199 (1972), the Supreme Court set forth the factors to be considered in determining whether the identification was reliable. These factors include the opportunity of the witness to view the suspect at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the suspect, the level of certainty of the identification, and the time between the crime and the identification. Id.

The photographic lineups used in the instant case were not impermissibly suggestive. They included six African American men of similar age and build to the defendant. Each of the men in the photo arrays had very short hairstyles and no facial hair. The skin tones of the men depicted in the photo arrays were similar.

The defendant does not stand out in his red t-shirt. Two other individuals in the photographic lineups had red clothing, one individual was wearing a red t-shirt, the other individual had a red shirt or cloth draped over his right shoulder. The undersigned is not persuaded by the defendant's argument that because the defendant was shown wearing a red t-shirt in some of the photographic lineups, Government's Exhibits 4 - 6 and 9, that this improperly suggested to the witnesses who identified the defendant that the defendant was in custody. The undersigned notes that the jumpsuits worn in the

11

Miami-Dade County jail are orange. Only a portion of the inmate population, the safety cell population, wear red jumpsuits. There is no evidence that the witnesses who identified the defendant knew that some inmates wear red jumpsuits. The red jumpsuits worn by the safety cell inmate population have a v-neck collar with buttons down the front. The red, crew neck t-shirt worn by the defendant in the photographic lineups had no buttons and is easily distinguishable from the safety cell jumpsuits.

Because the photographic lineups shown to the witnesses were not suggestive, the undersigned does not need to reach the second inquiry, whether the identification was reliable. Neil, 409 U.S. at 199.

**B.     The Defendant's Post Arrest Statements to Law Enforcement**

The defendant seeks to suppress post arrest statements he made to law enforcement officers. See Motion to Suppress Post Arrest Statements (DE# 39, 2/6/09). The defendant argues that there was never a knowing waiver of the defendant's Miranda rights because police officers threatened and physically intimidated the defendant during his arrest. Id. at 2. At the evidentiary hearing, the government presented evidence that the defendant was read his Miranda rights and he voluntarily and intelligently waived them.

In order to establish a waiver of Miranda rights, the government must show, by a preponderance of the evidence, that the defendant voluntarily, knowingly, freely and intelligently waived those rights, with knowledge of the consequences of the waiver. Colorado v. Connelly, 479 U.S. 157, 168 (1986). The validity of the waiver depends upon the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused. Edwards v. Arizona, 451 U.S.

477, 482 (1981). Factors that should be considered in making such a determination include: age of the accused, educational level, level of intelligence, whether there was advisement of constitutional rights, length of detention and the nature of the questioning. See Townsend v. Sane, 372 U.S. 293, 307 (1962).

      The undersigned finds that the post arrest statements made by the defendant were voluntary. The defendant argues that "the questioning [in the instant case,] was conducted under physical coercion, under threats, and of severe punishment to the defendant." See Motion to Suppress Post Arrest Statements (DE# 39 at 3, 2/6/09). "The standard for evaluating the voluntariness of a confession is whether the accused 'made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.'" United States v. Rouco, 765 F.2d 983, 993 (11th Cir. 1985) (citing Jurek v. Estelle, 623 F.2d 929, 937 (5th Cir.1980) (en banc), cert. denied, 450 U.S. 1001 and 450 U.S. 1014 (1981)). In determining voluntariness, the court must consider the totality of the circumstances. Blackburn v. State, 361 U.S. 199, 206 (1960). The undersigned does not find credible the defendant's testimony that he was threatened and beaten by Detective Cox. There is substantial evidence contradicting the defendant's account of police mistreatment. The defendant was at all times calm and cooperative. Here, the defendant was not threatened or physically intimidated.

      The government has shown, by a preponderance of the evidence, that the defendant received notice of his Miranda rights and with such notice, the defendant knowingly, freely and voluntarily waived those rights. The defendant was read his Miranda rights by Detective Garcia within one or two minutes of being taken into

custody, he agreed to waived those rights and proceeded to take law enforcement officers to Mr. Green's house. At the station, Detective Goldblatt presented the defendant with a written Miranda waiver form. See Miranda Waiver form, Government's Exhibit 1. The defendant answered "yes" to each question on the Miranda waiver form by placing his initials and signed the bottom of the form indicating that he understood his rights and that he was signing the statement of his own free will and without any threats or promises. Id.

      The undersigned finds that the defendant intelligently and voluntarily waived his Miranda rights. The undersigned had the opportunity to observe the defendant testify and concludes that the defendant appears to be of reasonable intelligence. The defendant had prior experience with the criminal justice system[5] and was neither coerced nor threatened into making statements to law enforcement. The defendant's assertion that he was struck in his eye and his lip by Detective Cox is not believable. The defendant has an interest in testifying that he was beaten by law enforcement officers. The undersigned credits the testimony of law enforcement officers that the defendant did not complain of any injuries, did not request medical attention and had no visible injuries. The undersigned also credits the testimony of Detective Hylton that the defendant was not beaten. Detective Hylton was present in the unmarked vehicle when Detective Cox allegedly struck the defendant.

      The defendant demonstrated a reluctance to admit implicating co-defendant Irvin Green. The defendant testified that Detective Cox beat him when the defendant

---

[5] The photograph of the defendant used for the photographic lineup prepared by Detective Garcia was a booking photograph from a prior arrest.

allegedly refused to tell him where Mr. Green was.  When the defendant was taken into custody,  the defendant told law enforcement officers that he knew where Mr. Green resided but did not want to be seen. As a result, law enforcement arranged for an unmarked car with dark tinted windows to transport the defendant to Mr. Green's residence. When the defendant saw Mr. Green outside his residence, the defendant instinctively ducked to avoid being seen by Mr. Green.  Thus, the defendant has shown an interest in testifying that he did not implicate Mr. Green and was beaten by law enforcement as a result.

In sum, the undersigned concludes that the defendant was not beaten, coerced or threatened by law enforcement and intelligently and voluntarily waived his Miranda rights. Accordingly, it is recommended that the defendant's statements not be suppressed.

## CONCLUSION

The defendant's Motion to Suppress Post Arrest Statements (DE# 39, 2/6/09) and Motion to Suppress Identifications and Memorandum of Law (DE# 40, 2/6/09) should be denied. The photographic lineups presented to witnesses of the robberies were not unduly suggestive. Additionally, the defendant's post arrest statements to law enforcement should not be suppressed. The defendant knowingly and voluntarily waived his Miranda rights. The defendant was neither coerced nor threatened into making statements to law enforcement.

## RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Motion to

Suppress Post Arrest Statements (DE# 39, 2/6/09) and Motion to Suppress Identifications and Memorandum of Law (DE# 40, 2/6/09) be **DENIED**. Pursuant to 28 U.S.C. §636(b)(1)(B) and (C), the parties may serve and file written objections to this Report and Recommendation with the Honorable Patricia A. Seitz, United States District Judge, within ten (10) days of receipt of a copy of this Report and Recommendation. See Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982). **A party filing an objection to this Report and Recommendation shall order a transcript of the suppression hearing and promptly provide a copy to the district court.**

DONE AND ORDERED in Chambers, at Miami, Florida, this **9th** day of March, 2009.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
U.S. District Judge Seitz
All Counsel of Record